## Commercial Bank *versus* Woodside et al.

1. It is essential to a sale of land, made in 1836, for taxes, that it has been assessed and returned as unseated, or, where it has been returned as a *seated* tract or lot, that it be transferred to the *unseated* list by the county commissioners, or their authorized agents, with notice to the owner, if practicable, before sale.

2. If there be uncertainty in the description of property sold at a county treasurer's sale, evidence *aliunde* may be received to designate it.

ERROR to the Common Pleas of *Schuylkill* county.

This was an ejectment by the Commercial Bank of Pennsylvania against Robert Woodside and William Haggerty, for a lot of ground in the borough of Pottsville, on the south side of Market street, twenty-five feet from the corner of the Market square.

The plaintiffs showed a perfect title to the lot in question, from John Pott, the proprietor of the town of Pottsville, and who occupied the said town-plat, with other land, as a seated tract.

It was a part of the plaintiff's evidence, that on the 30th of June, 1832, John F. Hallerman conveyed the lot in question to Thomas Ashburner, and the conveyance was, on the 13th day of July, A. D. 1832, recorded in deed book No. 12, p. 566 ; and on the 20th day of Nov., 1835, the said Thomas Ashburner conveyed the same lot to the plaintiffs, and the deed thereof· was also recorded on the 29th day of Dec., A. D. 1835.

The *defendants* claimed under a tax sale by the county treasurer in June, 1836.

The *defendants*, in order to establish a tax sale of the lot in question, offered in evidence the assessment from the commissioners' office for the year 1834, containing the following assessment in the regular list of seated property, to wit:

"Ashburner Thomas, Philadelphia—
1 25 feet lot by 114 feet, corner of Market and
                    Courtland streets, $50 } 100. 70. 10."
1 25  "          "   " adjoining the above, 50 }

To which plaintiffs objected, because it is assessed as seated land, and not unseated. The defendants then called Godfrey Zulich, the then commissioners' clerk, who testified as follows:

"I came into the commissioners' office in the spring of 1845—I know nothing of the proceedings of the office before that time—I cannot say that this assessment contains any *unseated* lands—it contains nothing under the head of unseated lands. I have found that the unseated lands were under the head of unseated or non-residents in most of the books—they placed the unseated in the same book, but under a different head—there are no unseated or non-residents in this book, and it does not appear what it is, except

[Commercial Bank *v.* Woodside et al.]

houses and lots—I have seen unseated lots in the borough of Potts-ville assessments since 1841, but none before that time."

The defendants, in connection with this evidence, offered the *treasurer's book*, containing entries of the collectors' returns, and called Benjamin Christ, treasurer, who testified as follows:

"This is the treasurer's book, containing unseated and seated lands—they are the returns made by the collector to the commis-sioners, and the returns of the road taxes—the heading shows un-seated lands—by what appears in relation to other sales, the treasurer takes it from this book—this is a copy from the original returns."

*Cross-examined*—"The original returns are always filed in the Treasurer's office—I don't know the handwriting of this book."

The orignal return to the commissioners produced. It was as follows:

"Return of County and State tax of the Borough of Pottsville for the year 1834, Daniel Christian, collector."

1835, Feb. 23. It contained, *inter alia*, as follows:

|                              | County tax. | State tax. |
|------------------------------|:-----------:|:----------:|
| Ashbury Thomas, Philad., 1 lot, | 70.      | 10.        |

In the treasurer's book, under head of "Borough of Pottsville, County and State tax on the unseated lands for 1834, Daniel Christian, collector, entered Feb. 4th, 1836, was entered:

|                          | County tax. | State tax. |
|--------------------------|:-----------:|:----------:|
| Ashbury Thomas, 1 lot,   | 70.         | 10."       |

The defendants further offered and gave in evidence the treasu-rer's *sale book* of the sales in June, 1836, in the following words: "2 lots, *Ashburn* Thomas, 80 cents, commissioners $3.42." To the admission of which, exception was taken by plaintiffs' counsel.

And subject to the same exception, the defendants gave in evi-dence a deed, dated the 16th July, 1836, "Joseph Attinger, trea-surer, to the commissioners of Schuylkill county," containing the following description, to wit: One lot in the borough of Pottsville, owned by Thomas Ashburn.

And also, the entry by the commissioners of the lands purchased by them at treasurer's sale, in these words, to wit:—

*Borough of Pottsville.*

One lot of ground sold in the name of Thomas Ashburn.

|            |   |   |   |     |
|------------|---|---|---|-----|
| County tax | - | - | - | 70  |
| State tax  | - | - | - | 10  |
|            |   |   |   | ——  |
|            |   |   |   | 80  |

*Unseated Lands.*

Whole amount of tax due   -   -   -   -   -   $19 91
February 13th, 1843, sold to Robert Woodside for   6 00

And also a deed by the county commissioners to Woodside for

the lot, for the consideration of $6, describing the lot as owned by Thomas Ashburn.

Also an assignment by Robert Woodside of the one moiety to William Haggerty, the other defendant.

The defendants then called several witnesses, who proved that the lot in question was now in a thickly-settled part of the borough of Pottsville, and that valuable houses were constructed in its immediate neighborhood, in 1834, at the time of the assessment; that the said lot at that time was a cleared lot, but was not fenced, nor had it any buildings upon it.

The *plaintiffs* then gave in evidence a deed from John F. Hallerman to Thomas *Ashburner*, dated the 30th day of June, 1832, for a lot of ground on the corner of Market square, in the said borough, adjoining the lot in question, and precisely of the same size and dimensions, and which said deed was also placed upon record in deed book No. 12, page 565, the 13th day of July, A. D. 1832.

This deed was given in evidence to show that Thomas Ashburner was the owner of *two* lots of ground on Market street, in Pottsville, at the time of the assessment in 1834, and that he remained the owner of the said lot at the time of the treasurer's sale in 1836.

The plaintiffs also showed, by the testimony of Andrew Mortimer, that this corner lot was vacant and unimproved at the time of the assessment in 1834. In the language of the witness, "it was then in the same situation as the lot in question."

The case was tried before KIDDER, J. The plaintiff's counsel submitted various points:

1st Point.—If the ground on which the town of Pottsville is located, was a seated tract of land when it was laid out in lots, the lots so laid out could not thereafter be sold for taxes, as unseated, unless they were taken from the seated list and assessed as unseated lands.

1st Answer.—The court answer this point in the negative. This was, according to the evidence, a vacant town-lot, and it being assessed with taxes which were unpaid, it was competent for the commissioners to transfer it to the unseated list and direct its sale for taxes.

2d Point.—In order to authorize the sale of a town-lot in a thickly-settled town, such as the town of Pottsville, it must appear from the records that the lot in question was assessed as an unseated tract of land, and returned by the commissioners to the treasurer as such. It does not appear from the records in the office that there was any assessment made on the lot in question, as an unseated tract of land.

2d Answer.—The assessment of the lot in question, as exhibited upon the records of the commissioners and treasurer, was sufficient to authorize the sale under the act of Assembly.

[Commercial Bank *v.* Woodside et al.]

3d Point.—If the evidence shows that Thomas Ashburner was the owner of *two* lots of ground that were assessed as two lots, they could not legally be sold as one lot, and the sale would be void, even if the other facts would warrant a sale.

3d Answer.—The court answer this point in the affirmative. If two lots were actually sold as one lot, the sale would be void, and consequently no title would be conferred upon the purchaser.

4th Point.—If but one lot was sold, it appearing that Thomas Ashburner was the owner of two lots, and there being nothing to designate which was sold, the deed is void, for uncertainty.

4th Answer.—If but one lot was sold, we cannot say to you, under the evidence in this case, that the deed would be void for uncertainty. There is no evidence that Woodside took possession of but one lot in pursuance of his deed from the commissioners, and that is the one now in dispute. It appears that Ashburner owned two adjoining lots at the time of the assessment; and if Woodside purchased one, and took possession of one, the fact of there being one adjoining to it of the same size, would not render his deed void.

5th Point.—The property must be so described that the owner may know that it is his lot that is selling, and he could not know by the description in this sale.

5th Answer.—The lot was sufficiently described; and as the owner paid no taxes, he has no reason to complain.

6th Point.—It does not appear that the lots assessed in 1834 were ever returned to the treasury as unpaid, either by the county commissioners or collector, and the only return found, was one made in 1836, 4th of February, in the name of Thomas Ashbury; and on that return or assessment, no sale could take place until one year thereafter.

6th Answer.—The evidence in the case does not sustain this point. It appears by the evidence, that the assessment was made in 1834, and the sale from the treasurer to the commissioners was made in 1836, for taxes assessed in 1834.

The plaintiffs' counsel excepted to the answers of the court to the points submitted.

Errors assigned:

1. The court erred in admitting in evidence the assessment of 1834, because it nowhere appears that it was assessed as an unseated tract, but is amongst the seated lands; and as all the seated lands are assessed in the county by immemorial usage, and this assessment is to Thomas Ashburner, and not to Thomas Ashburn.

2. The court erred in admitting in evidence the so-called return of the collector of

| | County tax. | State tax. |
|---|---|---|
| Ashbury Thomas, Philadelphia, 1 lot, | 70 cts. | 10 cts. |

because it is not returned as unseated, but simply as a return of a tax that could not be collected from the person of Thomas Ashbury. It does not appear to have the least connection with the assessment of two lots to Thomas Ashburner, nor with the lot in question. And this return is not acted upon by the commissioners, and not signed by Daniel Christian, the collector, nor entered in the treasurer's office until February 4th, 1836, nearly a year after the sale to the plaintiffs.

3. The court erred in admitting the entry in the treasurer's book, for the purpose of showing that the lot in question was assessed and returned as unseated, because that entry is founded upon the return, and the return does not state the lot to be vacant or unseated, nor does it appear to be a return of the lot in question, nor of the lots assessed.

4. The court erred in admitting the treasurer's sales book, because it is stated to be a sale of two lots in the name of Thomas Ashburn, having no connection with the return of the collector, on which the sale is alleged to be founded. And for the same cause, the court erred in admitting the deed of the treasurer, and the proceedings of the commissioners thereupon, both of which describe one lot owned by Thomas Ashburn. .

5. The court erred in their answers to all the points submitted by the plaintiffs' counsel.

The case was argued by *Bannan*, for plaintiff in error.—He contended that error existed in the matter to which the 1st, 2d, 3d, and 4th bills of exceptions relate, because, that in order to authorize the sale of a town-lot, laid out upon a seated tract of land, and in a thickly-settled part of a town, it must appear that the said lot was taken from the seated list, and assessed as unseated. And it is not enough to prove, at the trial, after a sale to innocent purchasers, that the lot was in fact vacant at the time of the assessment. Reference was made to McCalmont *v.* McClelland, 3 *Pa. Rep.* 106; Owens *v.* Vanhook, 3 *Watts* 260. *Notice* to the owner should have been given: Larimer *v.* McCall, 4 *W. & Ser.* 133; Milliken *v.* Benedict, 8 *id.* 160; 4 *id.* 174; 13 *Ser. & R.* 151; 1 *Watts* 533; 1 *Barr* 80. Thomas Ashburner lived in Philadelphia at the time of the sale in 1836. The *assessment* is in the name of Thomas *Ashburner;* there is also a family of the name of *Ashburn*, and when the Bank saw the *advertisement* of two lots of ground in the town of Pottsville, in the name of Thomas *Ashburn*, what was there to inform them that it was their lot that was offered for sale?

*Parry*, for defendant, with whom was *Hegins*.—In Schuylkill county, previous to 1841, the seated and unseated land was placed in the assessment by the assessor, without distinction. By some

[Commercial Bank *v.* Woodside et al.]

assessors, part of the land was assessed under the head of "non-residents," whether unseated or improved.  The assessment thus made was transferred to the collector's duplicate, and where the land was unseated, he was exonerated from the tax, and the land returned as unseated by the commissioners to the treasurer, to be sold.  The lot in question was regularly assessed in 1834, by the assessor of the borough of Pottsville, and returned to the commissioners.  There was no property assessed in this assessment under the head of "non-residents."  The commissioners returned one of these lots as unseated to the treasurer, to be sold, as follows, viz.: Extract from treasurer's book of unseated lands—"Borough of Pottsville, county and State tax on unseated lands for 1834, Daniel Christian, collector, entered Feb. 4, 1836."  The lot was proved to have been unseated in 1834, in a state of nature, and unimproved. The treasurer's sale book shows a sale of *two* lots; *but this is clearly a clerical error.*  There was but *one* lot returned to the treasurer; and the deed from him to the commissioners is for one lot; and their record of the lands purchased by them shows the purchase of but one lot.  The lot was well assessed; or if there was an irregularity, it is cured by the act of 1815: Hubley *v.* Keyser, 2 *Pa. Rep.* 502; 1 *W. & Ser.* 328; 4 *id.* 269; 7 *id.* 260.  It is immaterial in what name the lot was taxed and sold: 1 *W. & Ser.* 166; 6 *id.* 520; 7 *id.* 386; 3 *id.* 238.  The description of the lot in the assessment, and treasurer's and commissioners' deeds, is sufficient.  The question of identity was for the jury, and has been decided: Coxe *v.* Blauden, 1 *Watts* 534; Burns *v.* Lyon, 4 *id.* 363.

The opinion of the court was delivered by

BELL, J.—It is essential to the validity of every tax sale of lands that the subject of it should be assessed and returned, by some competent authority, as unseated, or, where it has been rated as a *seated* tract or lot, that it be transferred to the unseated list, by the commissioners of the county, or their authorized agents, with notice to the owner, if that be possible.  This is the doctrine of all the cases in which the subject has been treated.  They settle, indisputably, that an omission, in this particular, is uncured by the act of 1815, which applies only to irregularities in the proceeding.  It is the assessment, says Larimer *v.* McCall, 4 *W.* 35; *S. C.* 4 *W. & Ser.* 133, "which confers the power to sell in the same manner as a judgment on which an execution is issued.  Without this, there is no authority to divest the title of the owner, and if a tract be returned as seated, it cannot be sold for taxes."  To the same effect are the other adjudications, down to Milliken *v.* Benedict, 8 *Barr* 169.  These also deny the right of a collector, or other officer, except the commissioners of the county, to transfer land from the seated to the unseated list after the assessor has made his return, and emphatically point out the injustice which otherwise might be

[Commercial Bank *v.* Woodside et al.]

inflicted on owners, who, resting upon the return of their property as seated, and therefore not liable to sale, are entitled to await the visit of a collector, or, at least, notice that public convenience has dictated a change in the manner of assessment.   Ordinary propriety exacts this where the lands assessed remain the property of the same individual, but its stringency is much enhanced where a tract assessed as seated is purchased by a stranger after the assessment.   Upon this point it was observed in Owens *v.* Vanhook, 3 *Watts* 260, that "while the same person continues owner of the land, it may be less material whether it is taxed as seated or unseated, or that it be transferred from one list to the other ; but to a purchaser, it may be most material ; if taxed as unseated lands, he can *discover that* by application to the treasurer, and retain the amount out of his purchase-money to meet the lien ; if not in the list of unseated lands, the taxes, though unpaid, are no lien.   To change property from the seated to the unseated list, after a purchaser had paid his money, would be then most unjust as respects him."   In that case, it was proved the lot sold was vacant and unimproved at the time of the assessment, and that the proper collector had so returned it, as a reason why he could not collect the tax.   But it did not appear the commissioners had acted on this return, or exonerated the collector from liability for any part of the taxes charged in his duplicate.   And it was determined the sale was void for want of authority.   The conclusion was put on the express ground that the commissioners cannot change land from the seated to the unseated list, so as to affect an honest purchaser, nor can they sell as unseated, property taxed as seated and never transferred to the unseated list.   I am aware that in Frick *v.* Sterrett, 4 *W. & Ser.* 269, decided at the same time with Larimer *v.* McCall, it was held that a town-lot, situate in a county where a practice had obtained of assessing seated and unseated lands without discriminating between them, was well sold as vacant.   But there the collector had returned it as vacant, and, as a consequence, claimed to be exonerated from the collection of the tax imposed on it, which exoneration was conceded by the commissioners, and the lot thereupon transferred to the unseated book kept in the treasurer's office, according to a general usage.   The records of the commissioners' office had been destroyed by fire.   Under these circumstances, it was thought fair to infer that the commissioners had transferred the property to the unseated list before the sale.   The decision proceeded upon the assumed action of the commissioners, the only persons authorized to interfere, based on the exoneration of the collector and the proved practice of the office ; and, as the question of notice was not raised, it is in harmony with the preceding adjudications.   Indeed, it would be scarce respectful to suppose it was intended to conflict with Larimer *v.* McCall, just before determined for the third time.

[Commercial Bank *v.* Woodside et al.]

The governing rule, ascertained by these precedents, is, I think, decisive of the present controversy. The land, here in question, was assessed and returned as a seated lot in the year 1834, and preceding years. Throughout the county of Schuylkill generally, it was usual to distinguish, in the assessor's returns, between improved and vacant lands, the latter being designated by the term "non-residentor." But up to 1841, it was not customary to return as unseated any of the lots situate in the borough of Pottsville. If we may judge from the return before us, made in 1834, and the foundation of this difficulty, seated and unseated land was not simply confounded, but every species of property was treated as being represented by some responsible individual as owner, who was to be looked to for the taxes. Thus we find the lot in question returned as belonging to Thomas Ashburner, of Philadelphia, in a long list of taxable items, consisting of houses, stores, shops, occupations of single freemen, and other lots. There cannot, therefore, be the least pretence for the position that an intent was entertained by the assessing officers to return this property as unseated. Every thing indicates a contrary intention, in consonance with the prevailing practice. As seated property it was inserted in the collector's duplicate, and, in 1835, he returned it to the commissioners as representing unpaid tax, in a list consisting of assessed persons who were dead, or had left the county, and of some other lots. But it is somewhat remarkable, that though each of the latter is noted in the return as being vacant, there is no such intimation as to the lot owned by "Thos. Ashbury, Philadelphia." No action upon this return appears to have been had by the county commissioners, and we hear nothing more on the subject until February, 1836, when, with other lots, it appears to have been entered as Thomas Ashbury's, in a book kept by the county treasurer, containing entries of unseated lands. These entries, it is said, were taken from the collector's returns to the commissioners, but it does not appear the latter authorized them or knew any thing of them. It is not even shown they exonerated the collector from liability for these taxes returned as uncollected. The attempted transfer from the seated to the unseated list was consequently made without authority, for it is almost needless to observe the county treasurer, of himself, is as powerless to effect such a change as the supervisor and assessor were determined to be in Larimer *v.* McCall, and Milliken *v.* Benedict. But in November, 1835, and, therefore, prior to the interference of the treasurer, Ashburner had conveyed the property in suit to the plaintiff, for a valuable consideration, and who, it must be presumed, was aware that the lot had been treated as seated by the county authorities. The case thus falls directly under the principles settled in Owens *v.* Vanhook, which protect an innocent purchaser from even the interference of the commissioners themselves, without notice. It is an

[Commercial Bank *v.* Woodside et al.]

instance of an attempt to deprive of his property one who, it must be supposed, relied in good faith upon what the public officers had done and sanctioned in 1834, and to put it in the strongest position for the defendant, sought to undo, without notice to him, in 1836, just four months before the sale. This would be the aspect worn by the case had it been shown the commissioners authorized the transfer to the unseated list. But this feature is wanting, and the defendant is, consequently, compelled to meet the additional objection of want of authority. Thus regarded, the treasurer's sale is obnoxious to two exceptions, each of which has been held as fatal by this court. Indeed, the whole proceeding seems to have been conducted with such utter disregard to even the decencies of form and contempt of every thing like certainty, that the most zealous advocate of the curative qualities of the act of 1815, would be more than puzzled in attempting to sustain it. The two distinct lots assessed in 1834 as the property of Thomas Ashburner, and particularly described by the assessor, are returned by the collector, in the succeeding year, as one lot, owned by "Thomas Ash*bury*," and it is so entered in what has been called the unseated land book, kept by the treasurer. But in the treasurer's sales book it is stated that in June, 1836, he sold to the commissioners *two* lots of Thomas As*burn* for a tax of 80 cents; while the latter officers acknowledge, by the entry made in their book, the purchase of but one lot of ground, sold in the name of Thomas Ashburn, which lot, it is stated, they sold to Robert Woodside, in February, 1843. The deed, too, made by the commissioners to Woodside, is for a single lot, formerly owned by Thomas Ashburn. It is easy to get over the alteration of the name from Ashburner to Ashburn and Ashbury, as a clerical error, and under the doctrine that an erroneous designation of the owner will not vitiate a tax sale. But the uncertainty as to the subject of the sale presents greater difficulty. Did the commissioners purchase *both* lots, or only one? If both, *sold as one*, it is conceded the sale is void. If they bought but one, which of them? If both, which of them did they afterwards sell to Woodside? for it is certain he bought but one. Upon this point the commissionrs' deed is silent. Were we confined to the official entries and the conveyance, I should be inclined to say they leave us in such doubt and uncertainty as to the answers proper to be returned to these questions, that it would be impossible to establish a title in the defendant. But the particular lot bought and sold may be designated by evidence *aliunde;* and if the purchaser, soon after the sale, took possession of one of the Ashburner lots, and afterwards treated it as his own, a jury might be satisfied that this was the property purchased. The court, in its answer to the plaintiff's fourth point, speaks of such a possession by Woodside, but there is no evidence of it upon the paper-books furnished us. To say the least, such proof is cer-

[Commercial Bank *v.* Woodside et al.]

tainly necessary to relieve the uncertainty suggested by the documentary evidence.

The answer returned to the sixth point is correct, upon the assumption that the lot returned by the collector in 1835, and registered by the treasurer in 1836 as vacant, was one of those assessed as Thomas Ashburner's in 1834, and sold to defendant in 1836. But whether this be so, is an inquiry for the jury, under all the evidence. The objection is that the court seems to have taken it for granted.

What has been said covers, and, perhaps, disposes of the whole case. Certainly so upon the evidence as now presented. The defendant may, possibly, make out a better case on a second trial.

Judgment reversed and a *venire facias de novo* awarded.